## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff-Respondent,

vs.                            No.    CIV 02-1123 LH/LCS
                                            CR 00-1257 LH

ROBERT ALLEN THOMAS,

        Defendant-Movant.

### MAGISTRATE JUDGE'S PROPOSED FINDINGS
### AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court on Movant's (Thomas') Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255, Request for an Evidentiary Hearing, Request for Judicial Notice, and Objection to the Exercise of Jurisdiction by a United States Magistrate Judge. Thomas, currently incarcerated and proceeding *pro se*, attacks the Judgment and Sentence entered on October 3, 2001, in the case styled *United States of America v. Robert Allen Thomas*, and numbered CR 00-1257 LH, United States District Court for the District of New Mexico.  The United States Magistrate Judge, having considered the arguments of counsel, record, relevant law, and being otherwise fully informed, finds that these matters are not well-taken and recommends that they be **DENIED**.

### PROPOSED FINDINGS

1.      Thomas requests that the Court take judicial notice of certain aspects of the law. The undersigned United States Magistrate Judge is fully familiar with the law and will endeavor to apply all relevant laws fairly and correctly.  Thomas' Request for Judicial Notice should be denied as moot.

2.      Thomas objects to the exercise of jurisdiction by a United States Magistrate Judge,

contending that his consent is required for referral of this matter from the Honorable LeRoy C. Hansen, United States District Judge. Thomas is mistaken. This case was properly referred to the undersigned United States Magistrate Judge to recommend an ultimate disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Thomas will be afforded an opportunity to object to these Proposed Findings and Recommended Disposition if he wishes. Judge Hansen will make a *de novo* determination of those portions of the Proposed Findings and Recommended Disposition to which an objection is raised before issuing his final ruling. *See* 28 U.S.C. § 636(b)(1). Judge Hansen may accept, reject, or modify, in whole or in part, the Proposed Findings and Recommended Disposition. *Id*. Because this matter was validly referred pursuant to 28 U.S.C. § 636(b)(1)(B), Thomas' objection should be overruled.

3.    On March 27, 2000, Thomas and two co-defendants, Brian Bradford and Margaret Montoya, were charged by criminal complaint with conspiracy to manufacture in excess of 50 grams of methamphetamine in violation of 21 U.S.C. § 846. (Docs. 1 and 17. ) On May 11, 2000, an Assistant Federal Public Defender represented Thomas at his first appearance and Thomas was detained pending a detention hearing. (Doc. 8.) On May 15, 2000, Carmen Garza, Esq., a private attorney serving on the Criminal Justice Act Panel, was appointed to represent Thomas. (Doc. 11.) On May 16, 2000, the Court held a detention hearing and detained Thomas pending trial. (Docs. 12 and 13.) On the same day, Thomas executed a Waiver of Preliminary Hearing and Continuance of Grand Jury Presentment and the Court issued an attached Order Tolling Speedy Trial Computation for 75 days. (Doc. 14.) On July 19, 2000, the Court granted the Government's Unopposed Motion to Expand Speedy Trial Indictment Time for an additional 30 days. (Docs. 19-20.) The Order stated that the extension ran until August 26, 2000.

4.      On September 12, 2000, Thomas was charged by Information with conspiracy to manufacture in more than 50 grams of methamphetamine contrary to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) in violation of 21 U.S.C. § 846.  (Doc. 23.)  On the same day, Thomas entered a pre-indictment plea to the information pursuant to a plea agreement.  (Docs. 26-27.)  The plea agreement provided that Thomas was responsible for 84 grams of methamphetamine and, consequently, that the base offense level would be 30, and that Thomas was entitled to a three-level reduction for acceptance of responsibility.  (Doc. 26.)  Thomas waived his right to appeal.  (*Id.*)

5.      The Court ordered a Presentence Report (PSR).  The PSR found that a total of 101.7 grams was attributable to Thomas, but that only 84 gram should be attributed pursuant to the pleas agreement and established Thomas' base offense level at 30.  (PSR ¶ 22.)  Thomas' base offense level was adjusted upward by two levels because two firearms were found in his bedroom, in close proximity to the methamphetamine and the laboratory.  *See* U.S.S.G. § 2D1.1(b)(1).  The base offense level was adjusted downward by three levels for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, for a total adjusted offense level of 29. (PSR ¶¶ 29-31.)

6.      The PSR found that Thomas had one prior criminal conviction.  (PSR ¶ 34.)  Based on one criminal history point, Thomas was assigned to Criminal History Category I.  (PSR ¶ 35.)  With an adjusted base offense level of 29 and a Criminal History Category I, Thomas' guideline imprisonment range was 87 to 108 months.  (PSR ¶ 60.)  However, due to the mandatory minimum sentence of ten years, 21 U.S.C. § 841(b)(1)(A), the guideline range was 120 months pursuant to U.S.S.G. § 5G1.1(b).  (PSR ¶ 52.)  The probation officer determined that Thomas was not entitled to the "safety valve" because he did not meet the criteria of 18 U.S.C. § 3553(f)(1)-(5) in that he possessed two firearms in connection with the offense.  (PSR ¶ 53.)  The recommended sentence was

120 months. (PSR.)

7.      On January 4, 2001, Ms. Garza filed objections to the PSR, arguing that Thomas should not receive two criminal history points for possessing a firearm because there was no connection between the firearms and the drug offense.  (Doc. 28.)  Thomas contended that the firearms were used for target practice and were not connected to the methamphetamine.  (*Id.*)  On February 7, 2001, the Government filed a response to Thomas' objections to the PSR, asserting that the firearms were found in Thomas's bedroom in close proximity to both the methamphetamine and the methamphetamine laboratory.  (Doc. 29.)  The Government further stated that Thomas admitted that he and a co-defendant stole the rifles from a neighboring trailer during the time period that they were actively manufacturing methamphetamine.  (*Id.*)

8.      On February 13, 2001, the Honorable James A. Parker, Chief United States District Judge, convened a hearing to address Thomas' objections to the PSR.  (Doc. 31.)  Thomas testified that he and Brian Bradford, a co-defendant, had stolen two .22 caliber rifles from a neighboring trailer and that he and Bradford used the rifles once to shoot at cans in the desert.  (Tr. 2-13-01  Hr'g at 8-10.)  Thomas testified that the rifles were kept in a spare bedroom closet in the trailer where Thomas was living and manufacturing methamphetamine, that the distance from the meth lab to the closet was about 30 to 40 feet, and that the rifles were not used in connection with the methamphetamine by Thomas or his co-defendants.  (Tr. 2-13-01 Hr'g at 9-10.)

9.      On cross examination, Thomas admitted that he and Bradford had stolen the rifles during the period that they were manufacturing methamphetamine.  (Tr. 2-13-01 Hr'g at 12.)  Thomas also admitted that he carried a .22 caliber pistol during the time period that he was engaged in manufacturing methamphetamine, that Bradford killed a man with a gun, and that they stole the

4

rifles during the course of the conspiracy to manufacture methamphetamine. (Tr. 2-13-01 Hearing at 12-15.) Thomas also testified that he would probably not be surprised to learn that Bradford kept methamphetamine in the same room as the rifles in close proximity to the weapons, and that he would not be surprised to learn that Margaret Montoya, the other co-defendant, wrote notes indicating that the methamphetamine was intended for sale, not only for personal use. (Tr. 2-13-01 Hearing at 15-16.) The Court noted that Thomas' testimony conflicted with the PSR, and continued the hearing to allow the Government to present evidence. (Tr. 2-13-01 Hearing at 19-21.)

10.     On March 9, 2001, the Government filed Objections to the PSR, contending that Thomas willfully obstructed justice by testifying falsely at the evidentiary hearing on February 13, 2001, and that he was no longer entitled to the two-level reduction based on acceptance of responsibility. (Doc. 32.) The Government further asserted that the total adjusted offense level should have been set at 43 pursuant to U.S.S.G. § 2A1.1. As grounds for this increase, the Government alleged that Thomas killed Sean Conroy under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial jurisdiction of the United States. (*Id.*)

11.     On March 27, 2001, Ms. Garza filed a Response to the Government's Objections, arguing that the Government's objections were untimely, that the objections were a product of vindictive prosecution, that Thomas was entitled to a jury trial on the murder charge pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and that Thomas was entitled to the two-level reduction for acceptance of responsibility. (Doc. 36.)

12.     On April 10, 2001, Chief Judge Parker reconvened the hearing on the objections to the PSR and heard additional testimony, this time from the Government's witnesses. (R. at 37.) Ms.

5

Garza objected to the Court hearing evidence of the murder based on the untimeliness of the Government's objections and *Apprendi*. (Tr. 4-10-01 Hr'g at 9-10.) She also argued that she was not prepared to defend a murder case at a sentencing hearing. (*Id.*) Chief Judge Parker determined that the testimony should be limited to the facts in the PSR that were called into question by Thomas' testimony at the February 13, 2001 hearing, specifically the issues of whether the weapons found in the trailer were involved with methamphetamine and whether the methamphetamine was manufactured for distribution and not for personal use. (Tr. 4-10-01 Hr'g at 10-12.)

13.     FBI Agent Daniel Sarkozy testified that he received a report from Mr. Carpenter, a concerned citizen living in Buckhorn, New Mexico, that a young girl living in the trailer next door was the "spitting image" of a missing child posted on the internet. (Tr. 4-10-01 Hr'g at 16.) On March 23, 2000, Agent Sarkozy and FBI Agent Brotan traveled Buckhorn to investigate. (*Id.*) Upon investigation, the town postmaster and Mr. Carpenter positively identified Mr. Carpenter's young neighbor as the missing child. (*Id.*) Agent Sarkozy placed the trailer under surveillance and learned that it was occupied by Thomas, Bradford, Montoya, and the child. (*Id.*) Mr. Carpenter reported that the male occupants of the trailer carried firearms, and that either Thomas or Bradford had told Mr. Carpenter that they needed to carry firearms all of the time because they now lived in the country. (*Id.* at 17.)

14.     When Bradford left and drove toward Silver City, Agent Sarkozy, Agent Brotan, and Grant County Sheriff Deputy Kevin Flamm followed and conducted a traffic stop. (Tr. 4-10-01 Hr'g at 18.) Bradford appeared to be high on methamphetamine and confirmed that a young girl lived with him in the trailer, along with Montoya, who was the girl's mother, and Thomas. (*Id.* at 18-19) Agent Sarkozy showed Bradford a picture of the missing child. (Tr. 4-10-01 Hr'g at 25.) Bradford said

that the picture resembled Montoya's daughter, but that he did not think that it was actually her. (*Id.* at 25.)

15.     During the traffic stop, dispatch announced that Mr. Carpenter had just called in to report that a man, woman and child were in the river area behind his property shooting a gun. (Tr. 4-10-01 Hr'g at 18.)  The agents and the deputy transported Bradford back to the trailer to intercept the others before they went back inside the trailer.  (Tr. 4-10-01 Hr'g at 18; 24.)

16.     Thomas, Montoya and the child were walking across Carpenter's property towards their trailer when the agents, deputy and Bradford arrived.  (Tr. 4-10-01 Hr'g at 19.)  Agent Sarkozy intercepted Thomas, Montoya, and the child while they were still on Mr. Carpenter's property and told them to "freeze." (*Id.* at 20-21.)  Thomas had the little girl on his shoulders and the rifle slung across his back.  (*Id.* at 21.)  Agent Sarkozy asked Thomas to put the little girl down. (*Id.*)  After Thomas complied, they disarmed and handcuffed him.  (*Id.*)

17.     DEA Agent Mike Murphy testified that he went to the trailer in Buckhorn on March 24, 2000, the day after Thomas was arrested, and videotaped the interior.  (Tr. 4-10-01 Hr'g at 28.)  After the videotape was played in open court, Agent Murphy testified about the items depicted on the videotape. (*Id.* at 30-31.)  About three grams of methamphetamine and four grams of marijuana were found in the kitchen area.  (*Id.* at 31-33.)  Six more grams of methamphetamine as well as chemicals and equipment used to manufacture methamphetamine were found in the kitchen cabinets. (Tr. 4-10-01 Hr'g at 34.)

18.     Additional manufacturing chemicals were found in the refrigerator and freezer.  (Tr. 4-10-01 Hr'g at 35.)  About 100 grams of pseudoephedrine was found in bundles next to the refrigerator. (*Id.* at 38.)  The estimated yield of the chemicals was 84 grams of methamphetamine.

(*Id*. at 40.)  Six .22 caliber shells and 30-30 ammunition were found on a chair near the kitchen. (*Id*. at 41.)

19.     Agent Murphy testified that marijuana and a half a gram of methamphetamine were found in the master bedroom.  (Tr. 4-10-01 Hr'g at 42.)  Another 3.7 grams of methamphetamine were found in the front bedroom, on the opposite side of the trailer from the master bedroom.  (*Id*. at 43.)  In the back bedroom, also opposite the master bedroom, Agent Murphy found 10.7 grams of marijuana with .22 rounds and a shotgun shell.  (*Id*. at 44.)  An additional 9 grams of methamphetamine was seized from Montoya's backpack.  (*Id*. at 45.)  The spare bathroom had stains consistent with an explosion or flare up during the methamphetamine manufacturing process.  (*Id*. at 45-46.)

20.     Notes concerning manufacture, (Tr. 4-10-01 Hr'g at 48-53; 56-60), and distribution of methamphetamine, (*id*. at 62-63), were also discovered. Scales were on the counter, indicating distribution.  (*Id*. at 54.)  A DEA chemist estimated the yield from the chemicals on hand at 84 grams of pure methamphetamine.  (*Id*. at 68.)  The maximum quantity that a heavy user would consume would be a gram and a half per day.  (*Id*.)  No baggies were found and the manner in which the seized methamphetamine was packaged was not consistent with distribution.  (*Id*. at 72-73.)  The 84 grams was equivalent to about 16,400 average doses of methamphetamine.  (*Id*. at 76.)

21.     Grant County Sheriff Deputy Kevin Flamm testified that on March 17, 2000, he was investigating a burglary at the Brown Fish Farm in Buckhorn.  (Tr. 4-10-01 Hr'g at 81.)  Two rifles, a motor, and a few other items had been taken.  (*Id*.)  Deputy Flamm testified that he followed foot prints from the fish farm to Thomas' trailer.  (*Id*. at 82.)  Deputy Flamm also assisted the FBI by pulling over Bradford and issuing him citations for speeding and no drivers license.  (*Id*.)  A check

8

revealed two misdemeanor warrants from Arizona for Bradford.  (*Id.* at 83.)

22.     Deputy Flamm assisted the FBI in the arrest of Thomas.  (Tr. 4-10-01 Hr'g at 83-84.)
A warrant check indicated two felony warrants from Arizona.  (*Id.*)  While they were waiting for the
warrant confirmations to come back, Montoya asked to use the restroom in the trailer.  (*Id.* at 85.)
Deputy Flamm told her he could allow her to use the bathroom, but she would have to be
accompanied for officer safety.  (*Id.*)  Deputy Flamm accompanied Montoya into the trailer and stood
by the master bedroom door while Montoya used the bathroom.  (*Id.*)  From where he stood, Deputy
Flamm could see the rifle hanging on the wall in the spare bedroom, and a rifle standing against the
wall in the livingroom.  (*Id.* at 87-88.)

23.     When she was finished with the restroom, Deputy Flamm walked Montoya outside
and asked for her consent to search the trailer.  (Tr. 4-10-01 Hr'g at 87-88.)  Montoya confirmed that
she resided in the trailer and consented to the search.  (*Id.*)  Flamm went back inside to search for the
rifles from the Buckhorn burglary.  (*Id.* at 88.)  He found a 30-30 hanging from the wall, another .222
high powered rifle hanging from the wall in one of the two smaller bedrooms, a 12 gauge pump
shotgun leaning against the wall by the front door, and a .22 rifle by a closet.  (*Id.* at 88-89.)  The
.222 and the .22 rifles were the guns stolen in the Buckhorn burglary.  (*Id.* at 89.)  Deputy Flamm
also observed a methamphetamine lab in the kitchen.  (*Id.* at 90.)  In the master bedroom, Deputy
Flamm found only little girl's and women's clothing.  (*Id.* at 91.)  The other bedrooms contained
men's clothing.  (*Id.* at 92.)

24.     On April 25, 2001, Chief Judge Parker issued Findings of Fact and Memorandum
Opinion, finding that the Government's witnesses gave credible testimony in support of the
statements set for in paragraphs 7, 8, 9, 10, 11, 12, 13, and 17 of the PSR.  (Doc. 38.)  Chief Judge

Parker adopted the factual statements in those paragraphs, and determined that Thomas testified falsely concerning the firearms found in the trailer and that this false testimony resulted in an obstruction of justice.  (*Id.*)  Accordingly, Chief Judge Parker concluded that Thomas' base level offense should be increased by two levels pursuant to U.S.S.G. § 3C1.1.  (*Id.*)

25.     Additionally, Chief Judge Parker found that the Government had clearly and convincingly established that a dangerous weapon was possessed at the time that Thomas committed the offense.  (Doc. 38.)  Thus, Thomas' objection to the two-level firearm increase was denied, and the PSR's findings regarding the firearm were sustained.  (*Id.*)  Chief Judge Parker found that Thomas was not entitled to acceptance of responsibility and sustained the Government's objection to the three-level decrease.  (*Id.*)  The net result of the rulings on the objections increased Thomas' total base level offense from 29 as determined by the PSR, to 34.  With a Criminal History Category of I, the guideline imprisonment range was 151-188 months.  U.S.S.G. § 5 Part A.

26.     Chief Judge Parker determined that the question of who killed Conroy would be more appropriately decided by a jury in a criminal prosecution rather than by a judge hearing evidence at sentencing that would be inadmissible at trial under the Federal Rules of Evidence.  (Doc. 38.)  Chief Judge Parker directed the Government to notify the Court and Thomas whether it intended to proceed with the murder enhancement by May 15, 2001.  (*Id.*)

27.     The Government agreed to withdraw its objection based on the failure of the PSR to use a base level offense of 43 based on the alleged murder of Conroy as relevant conduct, but still expressed a desire to put on evidence of the murder.  (Letter from Chief Judge Parker to Counsel, 5-21-01.)  Ultimately, sentencing was reset for September 5, 2001.  (Doc. 47.)  Chief Judge Parker took evidence regarding the alleged murder at a hearing that continued into September 6, 2001.  (*Id.*)

28.     On September 6, 2001, Chief Judge Parker ruled that while the theory expressed by the Government might have merit, he declined to make factual findings or depart upward based on the alleged murder.  (Doc. 47.)  Chief Judge Parker noted that with a total base level offense of 34 and a Criminal History Category of I, the guideline range was 151 to 188 months and sentenced Thomas to 188 months incarceration, to be followed by five years supervised release.  (Docs. 47-48.)  In accordance with the plea agreement, Thomas did not file a direct appeal.

29.     On September 4, 2002, Thomas filed his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.  (Doc. 1.)  In his § 2255 Motion, Thomas raises the following issues:

I.      Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

II.     Whether the Court and the Government violated the Petitioner's rights to a speedy trial under the Sixth Amendment.

III.    Challenge to the District Court's jurisdiction to impose the sentence, for failure to charge an offense in the Petitioner's information (indictment) is jurisdictional error.

IV.     Challenge to the length of sentence imposed in excess of the statutory maximum.

V.      Denial of effective assistance of counsel.

VI.     Denial of the right to appeal Petitioner's sentence.

30.     The § 2255 Motion, filed within one year of the Judgment and Sentence, is timely under the Antiterrorism and Effective Death Penalty Act.  *See* 28 U.S.C. § 2255.  Thomas requests an evidentiary hearing.  An evidentiary hearing is not necessary because "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255;

*see also United States v. Lopez*, 100 F.3d 113, 119 (10th Cir. 1996).  Accordingly, Thomas' request for an evidentiary hearing should be denied.

31.     Thomas did not raise his claims on direct appeal.  "Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (*quoting Reed v. Farley*, 512 U.S. 339, 354 (1994) *and Sunal v. Large*, 332 U.S. 174, 178 (1947)).  When a defendant fails to raise a claim on direct appeal, he is barred from pursuing that claim in a later § 2255 proceeding, absent a showing of cause and actual prejudice, or a fundamental miscarriage of justice. *United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002) (*citing United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994)); *see also United States v. Frady*, 456 U.S. 152, 167-68 (1982).  This bar does not apply to ineffective assistance of counsel claims. *United States v. Galloway*, 56 F.3d 1239, 1241 (10th Cir.1995).  Thomas frames Claims I, II, V, and VI in terms of error on the part of his attorney.  Thus, Claims I, II, III, V, and VI are not subject to the procedural bar.

32.     Thomas does not claim ineffective assistance of counsel with respect to Claim IV. Thus, Claim IV is procedurally barred unless Thomas can establish cause and prejudice, or a fundamental miscarriage of justice.  Thomas does not make, and the record does not support, an assertion of cause or prejudice, or actual innocence.  *See Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Claim IV is procedurally barred.

33.     Additionally, Claim IV is wholly without merit.  In Claim IV, Thomas contends that he was sentenced in excess of the statutory maximum in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 481-82 (2000).  The statutory maximum in this case was life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A).  Thomas was sentenced to 188 months, which is less than the statutory maximum.

*Apprendi* only applies where aggravating factors increase the sentence beyond the statutory maximum. *Id*. at 490. Because Thomas was not sentenced in excess of the statutory maximum, *Apprendi* was not applicable and Claim IV is without merit.

34. Claims I, II, and VI are subsumed by Claim V, the ineffective assistance of counsel claim. Thomas claims his attorney was ineffective because she failed to challenge the search and seizures that led to his arrest, failed to file a motion to dismiss based on alleged violations of his speedy trial rights, failed to investigate, failed to file discovery motions, coerced him into waiving his preliminary hearing and grand jury presentment, coerced him into pleading guilty, failed to investigate of file discovery motions, coerced him into stipulating to the drug quantity, failed to object to the firearm enhancement, failed to object to the obstruction enhancement, and failed to file an appeal on his behalf.

35. In order to prevail on his ineffective assistance of counsel claims, Thomas must show that Ms. Garza's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for her unprofessional errors, the result of the proceedings would have been different. *See Strickland v. Washington*, 466 U.S. 668 (1984). The performance inquiry is " 'highly deferential' to counsel, presuming reasonable judgment and declining to second guess strategic choices." *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997).

36. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. Counsel's performance must be completely unreasonable, not merely ill-advised in hindsight. *See Fowler v. Ward*, 200 F.3d 1302, 1309 (10th Cir. 2000); *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997). A fair assessment of attorney performance requires a reviewing court "to eliminate the

distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

37.     The prejudice prong is similarly onerous; Thomas must demonstrate that but for counsel's errors, there is a reasonable probability that the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694.   A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*   "An ineffective assistance claim may be resolved on either performance or prejudice grounds alone." *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000); *see also Hatch v. Oklahoma*, 58 F.3d 1447, 1457 (10th Cir. 1995).

38.     Thomas alleges that Ms. Garza was ineffective because she failed to challenge the search and seizures that led to his arrest.[1]   Thomas has failed to satisfy either prong of *Strickland*. No reasonable attorney would have mounted a Fourth Amendment challenge under the facts of this case.

39.     The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The initial detention of Thomas and Montoya was justified because Agents Sarkozy and Brotan were investigating a kidnaping of a child and Deputy Flamm was investigating a burglary involving two rifles. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968).   When the officers encountered Thomas and Montoya, Thomas had a child on his shoulders matching the description of the missing girl and a rifle slung over his back.  Because the detention was justified at its inception and the scope was reasonably

---

[1]   In addition to being procedurally barred, a pure Fourth Amendment claim is not cognizable in this post-conviction proceeding under *Stone v. Powell*, 428 U.S. 465 (1976), because Thomas had a full and fair opportunity to litigate the issue at trial and on appeal. *See United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir. 1993).

related to the circumstances, it was valid under *Terry*. *Id*. 392 U.S. at 20.

40.     The warrant checks were justified because the officers had reasonable and articulable

suspicions that Thomas and Montoya had committed crimes. *United States v. Patten*, 183 F.3d 1190,

1193 (10th Cir. 1999).  The warrant check indicated two felony warrants from Arizona.  While they

were waiting for confirmations to come back on the warrants, Montoya asked to use the restroom

in the trailer.  Deputy Flamm told her he could allow her to use the restroom, but she would have to

be accompanied for officer safety.  (*Id*.)

41.     "It is a basic 'principle of Fourth Amendment law' that searches and seizures inside a

home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586

(1980) (*citing Coolidge v. New Hampshire*, 403 U.S. 443, 477-78 (1971)).  Absent consent or

exigent circumstances, police may not enter a citizen's residence without a warrant.  *Id*. at 590.

However, officers may take steps to "assure themselves that the house in which a suspect is being,

or has just been, arrested is not harboring other persons who are dangerous and who could

unexpectedly launch an attack." *See Maryland v. Buie*, 494 U.S. 325, 333 (1990).  Officers may

conduct warrantless searches "if they believe that their own lives or the lives of others are at risk."

*United States v. Wicks*, 995 F.2d 964, 970 (10th Cir. 1993).

42.     Thomas and Montoya were being held based on warrants for their arrests implicating

them in felony crimes.  Thomas was armed when the officers first encountered him and holding a

possibly kidnaped child.  Tracks from the site of a firearm burglary led to the trailer.  These facts

would cause a reasonable officer concern over his safety. With three suspected felons under

investigation and missing firearms in the neighborhood, Deputy Flamm was justified in searching the

trailer.

43.     From where he stood by the master bedroom while Montoya was using the bathroom, Deputy Flamm could see a rifle hanging on the wall in the spare bedroom, and a rifle standing against the wall in the livingroom.  Under the plain view doctrine, Deputy Flamm was permitted to properly seize evidence of a crime without a warrant if: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent--i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself." *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir.1999) (*internal quotations omitted*).  Plain view is yet another exception to the warrant requirement that would have supported the search in this case.

44.     When she was finished with the restroom, Deputy Flamm walked Montoya outside and asked for her consent to search the trailer.  Montoya gave her consent to search.  "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Thomas does not dispute that Montoya was a resident of the trailer and had authority to consent to its search.  Inside the trailer Deputy Flamm found the two stolen guns and two other firearms as well as the meth lab in the kitchen.  The search of the trailer was authorized by both exigent circumstances and consent.  A decision against raising a specious argument does not constitute ineffective assistance of counsel.  *See United States v. Cook*, 45 F.3d at 392-393.  Thomas has failed to show cause or prejudice with respect to Ms. Garza's decision to refrain from challenging the seizures and search under the Fourth Amendment.  Ms. Garza was not ineffective for failing to raise a Fourth Amendment claim.

45.     Thomas claims that Ms. Garza was ineffective in failing to challenge the charges

16

against him based on a violation of his speedy trial rights under the Sixth Amendment and the Speedy

Trial Act, 18 U.S.C. § 3161(a)(1).  Thomas specifically alleges that the fact that he was not indicted

within 30 days of his arrest violated the Speedy Trial Act, his waivers of preliminary indictment and

grand jury presentment were invalid, and that the Court erred in granting the Government's motion

to expand the speedy trial time.

46.     The right to speedy trial is triggered on arrest or the bringing of a formal charge.

*United States v. MacDonald*, 456 U. S. 1, 6 (1982). Thomas was arrested on March 27, 2000.  On

May 16, 2000, he waived his preliminary hearing, requested a continuance of grand jury presentment,

and requested an order tolling the Speedy Trial Act for not more than 75 days.  (Doc. 14.)  Both

Thomas and Ms. Garza signed the motion, and it was granted on the same day. The combination of

the 75 days requested in the motion and the 30 days allowed by statute, tolled the Speedy Trial Act

for 105 days from May 10, 2000, or until August 24, 2000.  *See* 18 U.S.C. §§ 3161(b) and 3161

(h)(8)(A).

47.     On July 17, 2000, the Government filed a Motion to Expand Speedy Trial Time

pursuant to 18 U.S.C. §3161(h)(8)(A) for an additional 30 days.  (Doc. 19.)  The court granted the

Motion with an Order containing the findings required by 18 U.S.C. § 3161(h)(8)(A) and purportedly

extended the speedy trial deadline to August 26, 2000.  (Doc. 20.)  However, because Thomas was

taken into federal custody on May 10, 2000, and filed the waiver on May 16, 2000, the additional 30

days granted on July 19, 2000 actually extended the deadline to September 23, 2000. (Docs. 14, 17,

19 and 20.)  On September 12, 2000, an Information was filed and Thomas pleaded guilty pursuant

to a plea agreement.  (Doc. 26.)   The Speedy Trial Act was not violated because the delays were

excludable from the speedy trial computation under 18 U.S.C. §3161(h).  In any event, Thomas has

failed to show that he was prejudiced by Ms. Garza's decision not to move to dismiss the charges within the meaning of *Strickland*.

48.     Thomas has also failed to establish ineffective assistance of counsel with respect to the his constitutional right to a speedy trial.  In determining whether a defendant has been deprived of his constitutional right to a speedy trial under the Sixth Amendment, a court should consider and balance the following factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *United States v. Lugo*,170 F.3d 996, 1002 (10th Cir. 1999) (*citing Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The constitutional right to a speedy trial applies through sentencing.  *Perez v. Sullivan*, 793 F.2d 249, 254 (10th Cir. 1986).

49.     Of these factors, the length of the delay is the threshold consideration.  Only if the delay is "presumptively prejudicial" will the court need to consider the remaining factors. *Lugo*, 170 F.2d at 1002.  While the length of the delay is to some extent a triggering mechanism, the length of delay that will provoke an inquiry into whether the Sixth Amendment has been violated is necessarily dependent upon the peculiar circumstances of the case.  *Barker*, 407 U. S. at 530; *Harvey v. Shillinger*, 76 F.3d 1528, 1533 (10th Cir. 1996).

50.     Eighteen and a half months elapsed between the arrest and sentencing.  This is not an inordinate delay in light of the complex nature of the case involving two co-defendants, a meth lab, an alleged murder, and stolen firearms.  Thomas moved for several continuances of the sentencing hearing to allow for additional investigation.  Thomas did not assert his speedy trial rights, but instead moved for, or agreed to, continuances.  Considering all the circumstances, the delay in this case was not prejudicial.  Because there was no speedy trial violation, Mr. Garza was not ineffective in failing

to raise this issue.

51.     Thomas claims that Ms. Garza was ineffective because she coerced him into pleading guilty by telling him the Government would file a superseding indictment, and coerced him into stipulating to the drug quantity.  The two-part Strickland test applies when a defendant challenges the validity of a guilty plea based on ineffective assistance of counsel.  *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).  In the guilty plea context, the first part of the Strickland test remains the same.  *Id.* In order to establish the second prong, however, the petitioner must show there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.  *Id.*

52.     Thomas executed a written plea agreement which accurately set out the consequences of his plea as well as his sentencing exposure.  (Doc. 26.)  At the plea hearing, Thomas stated on the record in open court he had discussed the plea with Ms. Garza and that he was satisfied with her representation.  (Tr. 9-12-00 Hr'g at 11.)  Thomas stated that he understood that the penalty was ten years to life.  (*Id.* at 5.)  Thomas stated that he understood that he was responsible for 84 grams of methamphetamine and that the guideline range would be determined by the PSR.  (Tr. 9-12-00 Hr'g at 6-9.)  The declarations of Thomas in the plea agreement and at the plea hearing demonstrate that Ms. Garza fully explained the consequences of the plea.

53.     Thomas has failed to show that there is a reasonable probability to he would have insisted on going to trial. Thomas was facing substantially higher exposure if he proceeded to trial because additional charges could have been brought against him and he would have lost the three points for acceptance of responsibility.  The testimony of the Government's witnesses at the sentencing hearings demonstrated that the Government's case against Thomas was strong.  Thomas

has failed to establish that his attorney's representation fell below an objective standard of reasonableness or that he would have insisted on going to trial. Ms. Garza did not provide ineffective assistance of counsel with respect to the guilty plea.

54.     Thomas asserts that Ms. Garza was ineffective because she coerced him into waiving his preliminary hearing and grand jury presentment. Thomas' assertions regarding his waiver of indictment and grand jury presentment are not supported by the plain language of the plea agreement, (Doc. 26), the waiver of indictment, (Doc. 25), or the transcript of the plea hearing. (Tr. 9-12-00 Hr'g at 11.) Persuasion by Ms. Garza does not vitiate Thomas' statements on the record. Thomas has failed to demonstrate that Ms. Garza's representation fell below an objective standard of reasonableness.

55.     Thomas' allegations that Ms. Garza failed to object to the firearm enhancement and failed to object to the obstruction enhancement border on the specious. The record reflects that Ms. Garza filed objections to the firearm enhancement and called Thomas to testify about his use of the firearm solely for target practice. After hearing the testimony of the Government's witnesses, Chief Judge Parker found that Thomas testified falsely and assessed him an additional two points for obstruction of justice, rescinded the three point credit for acceptance of responsibility, and overruled Ms. Garza's objections to the firearm enhancement.

56.     The PSR initially recommended that Thomas receive two points for acceptance of responsibility and no obstruction enhancement. It was only after Thomas lied on the stand that Chief Judge Parker assessed the additional points. Thomas cannot hold his lawyer responsible for his own misconduct. The *Strickland* inquiry is " 'highly deferential' to counsel, presuming reasonable judgment and declining to second guess strategic choices." *United States v. Williams*, 106 F.3d 1362, 1367 (7th

Cir. 1997).  A fair assessment of attorney performance requires a reviewing court "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

57.     Although Ms. Garza's sentencing strategy ultimately backfired, she was entitled to rely on the representations of her client.  *See Miller v. Bittner*, 985 F.2d 935, 939 (8th Cir. 1993). Thomas' attempts to second-guess Ms. Garza's strategy at sentencing are unavailing. Thomas must show that counsel's performance was completely unreasonable, not simply ill-advised in hindsight. *See Fowler v. Ward*, 200 F.3d 1302, 1309 (10th Cir. 2000); *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997).  In essence, Thomas seeks to re-litigate his case with the benefit of hindsight, an opportunity barred by law.  *See Fowler*, 200 F.3d at 1309.  A review of the record establishes that Ms. Garza's approach was reasonable strategy and did not constitute ineffective performance

58.     Thomas claims that Ms. Garza was ineffective because she failed to investigate and file discovery motions.  Counsel has a duty to make reasonable investigations. *Strickland*, 466 U.S. at 690.  A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. *Id.* at 690-91.  When an ineffective assistance claim centers on a failure to investigate and elicit testimony from witnesses, the movant must demonstrate, with some precision, the content of the testimony they would have given at trial.  *See Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990).  Thomas has offered no indication of any evidence that additional investigation might have revealed

59.     Finally, Thomas seeks to hold Ms. Garza ineffective because she failed to heed his request to file an appeal on his behalf.  Thomas waived his right to appeal in the plea agreement and on the record at the plea hearing.  "It is well established that a defendant's waiver of the statutory right

to direct appeal contained in a plea agreement is enforceable if the defendants has agreed to the terms knowingly and voluntarily." *United States v. Cockerham,* 237 F.3d 1179, 1181-82 (10th Cir. 2001) (*citing United States v. Atterberry*, 144 F.3d 1299, 1300 (10th Cir. 1998)).  Thomas' waiver of his right to appeal was knowing and voluntary because his plea was knowing and voluntary.  Because Thomas had validly waived his right to appeal, Ms. Garza was not ineffective by failing to file a direct appeal.

## RECOMMENDED DISPOSITION

I recommend that Thomas' Request for Judicial Notice (Doc. 2), filed September 4, 2002, be **DENIED AS MOOT**, that Thomas' Objection to the Exercise of Jurisdiction by a United States Magistrate Judge (Doc. 4), filed September 18, 2002, be **OVERRULED**, that Thomas' request for an evidentiary hearing be **DENIED**, and that Thomas' Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody be **DENIED**.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to 28 U.S.C. §636(b)(1)(C), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**